Ian T. Peck
State Bar No. 24013306
Eli O. Columbus
State Bar No. 24028062
David L. Staab
State Bar No. 24093194
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: eli.columbus@haynesboone.com
Email: david.staab@haynesboone.com

**ATTORNEYS FOR DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| Panda Temple Power II Intermediate Holdings II, LLC,[1] | § | Case No. 22-30810-MVL-7 |
| | § | |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| Panda Temple Power II, LLC,[2] | § | Case No. 22-30811-SGJ-7 |
| | § | |
| Debtor. | § | |
| | § | |

## DEBTORS' RESPONSE TO UNITED STATES TRUSTEE'S
## EMERGENCY MOTION TO DISMISS UNDER 11 U.S.C. § 707(a)
## WITH PREJUDICE TO REFILING FOR 180 DAYS

---

[1] The location of Panda Temple Power II Intermediate Holdings II, LLC's service address is 13901 Midway Road, Suite 102-431, Farmers Branch, TX 75244.

[2] The last four digits of Panda Temple Power II, LLC's federal tax identification number are 2361. The location of the Debtor's service address is 13901 Midway Road, Suite 102-431, Farmers Branch, TX 75244.

Panda Temple Power II Intermediate Holdings II, LLC ("Panda Holdings") and Panda Temple Power II, LLC ("Panda Temple II" and together with Panda Holdings, the "Debtors"), as debtors in the above-referenced chapter 7 cases, hereby file this *Debtors' Response to United States Trustee's Emergency Motion to Dismiss Under 11 U.S.C. § 707(a) with Prejudice to Refiling for 180 Days* (the "Response"). In support of the Response, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1.      The United States District Court for the Northern District of Texas (the "District Court") has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334. The District Court's jurisdiction has been referred to this Court pursuant to 28 U.S.C. § 157 and the District Court's Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b), which may be heard and finally determined by this Court. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Preliminary Statement[3]

2.      The Debtors own an electric generating facility located in Temple, Texas. The Debtors do not have sufficient liquidity to maintain operations and are in default under certain prepetition debt obligations.

3.      Prior to the Petition Date, the secured lenders of the Debtors accelerated certain prepetition debt obligations and posted substantially all of the Debtors' assets for foreclosure.

4.      After exploring all potentially viable alternatives, including exploring debtor in possession financing from the existing lender group, which the lender group was not willing to provide, the Debtors filed these Chapter 7 Cases for the good faith purpose of creating a breathing

---

[3] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings set forth in the Response.

space for a neutral third party, the Chapter 7 Trustee, to evaluate and marshal assets, administer claims, and make an orderly distribution to creditors.

5. The Chapter 7 Cases are in their infancy. The schedules and statements of financial affairs have not yet been filed, the Chapter 7 Trustee has had limited time to review the Debtors' assets, the majority of creditors have not yet received notice of the Chapter 7 Cases, and the meeting of creditors has not yet occurred. The value of the Debtors' assets is uncertain. Specifically, a recent valuation of the Debtors' assets has not been performed, and the Debtor has certain claims in an ongoing litigation that may be worth substantial value.

6. Despite these facts, the UST asserts that the Chapter 7 Cases were filed in bad faith and requests that the Court dismiss the Chapter 7 Cases. The UST's Motion is based on conclusory allegations.

7. The facts and circumstances of the Chapter 7 Cases do not warrant dismissal under section 707(a) of the Bankruptcy Code or applicable Fifth Circuit law. Given the possible upside for general unsecured creditors, the Debtors believe that administering the Chapter 7 Cases is the best available option to, among other things, preserve the value of the Debtors' estates, provide an efficient and centralized forum for administering claims, and to provide notice and a forum for creditors to evaluate the Debtors assets and have an opportunity to be heard. The Chapter 7 Cases were filed for a proper bankruptcy purpose, and the Motion should be denied.

## <u>Background</u>

### I. Filing of the Chapter 7 Cases

8. On May 2, 2022 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 7 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") commencing the above captioned cases (the "<u>Chapter 7 Cases</u>").

9.     Diane G. Reed was appointed as the Chapter 7 Trustee of the Chapter 7 Cases (the "Chapter 7 Trustee").

## II.    Company and Business Overview

10.     Panda Holdings is a holding company with no assets other than its ownership interests in Panda Temple II.

11.     Panda Temple II's primary asset is the Panda Temple II Generating Station (the "Temple II Project"), a clean, natural gas-fueled, 758-megawatt combined-cycle electric generating facility located in Temple, Texas.

12.     The Debtors are participants in the competitive wholesale electricity market operated by the Electric Reliability Council of Texas, Inc. ("ERCOT"), as described in further detail below.

### A.    Company History

13.     Panda Power Generation Infrastructure Fund, L.P. and its affiliated funds (collectively, "Panda Funds") are part of a Dallas-based private equity firm that develops, constructs, owns, operates, and manages investments in clean energy. It was established in 2010 by former senior management of Panda Energy International Inc. ("PEII"), an independent power development company that was founded in 1982. Nearly all of PEII's senior management and energy professionals transitioned to Panda Funds in 2010.

14.     The Temple II Project was originally financed with approximately $372 million of secured debt and approximately $312 million of equity. Construction of the Temple II Project began in April 2013 and commercial operations commenced in August 2015.

15.     In 2021, the Debtors' total revenue was approximately $338.3 million. For the three months ended March 31, 2022, the Debtors' total revenue was approximately $21.4 million.

**B.     Certain Agreements in Relation to Prepetition Operations**

16.     The Debtors do not hire or retain any employees directly, but instead rely on certain non-debtor affiliates for the day-to-day operation of the Temple II Project. Pursuant to an operation and maintenance agreement between Temple II and non-debtor affiliate PPG-O&M Panda Temple Power, LLC ("Panda O&M"), Panda O&M serves as the operator of the Temple II Project, providing services such as operation, maintenance and repair, supply of personnel, initial staffing, startup and testing, coordination of emergency actions, procurement of tools, equipment, consumables and other materials, management of inventory, development of plans and procedures, maintenance of records, delivery of reports and notices, and making day-to-day decisions regarding the operation of the Temple II Project.

17.     Panda Temple II is also a party to an amended and restated services agreement with non-debtor affiliate PPG Fund I, LLC ("PPG Fund"), pursuant to which PPG Fund provides Panda Temple II with general project development and operation and asset management services, including human resources administration, government reporting, accounting services, employee health and safety-related services, financial services, general corporate services, legal services, and development, construction and facilities services.

18.     Panda Temple II is also party to an energy management agreement with Tenaska Power Services Co. ("Tenaska"), which governs certain power, fuel, and risk management services that Tenaska provides to the Temple II Project as its energy manager. As the energy manager for Panda Temple II and the designated Qualified Scheduling Entity ("QSE"), Tenaska serves as the sole entity authorized to submit bids and offers to ERCOT and to liaise on all other operational matters with ERCOT, as well as procuring gas needed for operations.

### C. ERCOT Litigation Claims

19. As noted above, the Debtors are participants in the electricity market operated by ERCOT, which is subject to oversight from the Public Utility Commission of Texas and the Texas legislature. ERCOT is an independent system operator that manages the flow of electric power to customers in the state of Texas. ERCOT ensures that electrical supply equals demand in the market by regulating the power generated by various power plants. Among other things, ERCOT advises the market of the current and future supply and demand in its capacity, demand, and reserves reports ("CDR Reports"). Companies, like the Debtors, base their investment decisions on representations by ERCOT.

20. On February 29, 2016, the Debtors and certain other entities (collectively, the "Plaintiffs") filed a lawsuit against ERCOT alleging that ERCOT sponsored false and misleading CDR Reports in 2011 and 2012 and made other misrepresentations to the Plaintiffs concerning the need for capacity in the ERCOT market that induced the Debtors and their affiliates to invest nearly **$2.2 billion** to build new power plants in Texas. The Plaintiffs assert claims against ERCOT for, among other things, negligent misrepresentation, fraud, and breach of duty (the "ERCOT Litigation Claims").

21. On February 23, 2022, an *en banc* panel of the Court of Appeals for the Fifth District of Texas at Dallas issued an opinion in favor of the Plaintiffs, reversing the trial court's April 24, 2018, order granting ERCOT's plea to the jurisdiction and remanding the case to the trial court for further proceedings. In the opinion, the court held that (i) ERCOT is not entitled to sovereign immunity, and (ii) the Texas Legislature did not grant exclusive jurisdiction over the Plaintiffs' common law claims to the Public Utility Commission of Texas. The Debtors understand that ERCOT is expected to appeal the decision to the Texas Supreme Court. The lawsuit is

currently pending in the District Court of Grayson County, Texas under the caption *Panda Power Generation Infrastructure Fund, LLC (d/b/a Panda Power Funds), et al. v. ERCOT, No. CV-16-0401* (the "ERCOT Lawsuit").[4]

## III.    Capital Structure

22.    As of March 31, 2022, the Debtors' unaudited balance sheets reflected total assets of approximately $449.7 million and total liabilities of approximately $799.3 million. The balance sheet does not reflect the ERCOT Litigation or the Winter Storm Uri Litigation (defined below).

23.    The Debtors' prepetition funded debt structure primarily consists of obligations owed under the Credit Agreement (defined below) and the Settlement Agreement (defined below). The Debtors also have outstanding, unsecured obligations to various contract counterparties, vendors, and other general unsecured creditors. As of the Petition Date, the Debtors estimate that the amount of general unsecured claims total several hundred million dollars, the largest portion of which relates to non-performance costs under the Secured Commodity Hedge Agreement.

### A.    The Credit Agreement and the Settlement Agreement

24.    Panda Temple II; Beal Bank and Beal Bank USA (collectively, the "Secured Lenders"), and CLMG Corp. (the "Collateral Agent" and, together with the Secured Lenders, the "Secured Parties") are parties to a Second Amended and Restated Credit Agreement dated as of November 9, 2018 (as amended, the "Credit Agreement"). As of the Petition Date, according to the Secured Parties, the outstanding obligations under the Credit Agreement total approximately $413.7 million.

---

[4] The Plaintiffs also filed a fraud and misrepresentation suit against former ERCOT executives in Travis County, Texas. That case is currently pending in the Third Court of Appeals in Austin. *Plaintiffs v. Doggett*, 03-18-00695-CV (Third Court of Appeals, Austin, Texas).

25. The Debtors were also party to a settlement agreement (the "Settlement Agreement") entered into in connection with obligations that were owed under a secured commodity hedge agreement (the "Secured Commodity Hedge Agreement") with NextEra Energy Marketing, LLC, the predecessor in interest to South Texas Energy Supply Holdings, LLC (the "Hedge Provider").

26. As of the Petition Date, the outstanding obligations under the Credit Agreement and the Secured Commodity Hedge Agreement totaled approximately $375 million, $35 million of which is secured on a *pari passu* first lien basis with the claims under the Credit Agreement. The remainder is secured by a pledge of the ownership interest in Panda Holdings.

27. The obligations arising under the Credit Agreement and the Secured Commodity Hedge Agreement are secured by security interests in, and liens upon, substantially all of Panda Temple II's assets and 100% of the equity interests in Panda Temple II and in Panda Holdings.

28. The Debtors understand that the Secured Lenders acquired the secured portion of the Hedge Provider's claim prior to the Petition Date.

### B. Other General Unsecured Creditors

29. Certain contract counterparties, vendors, and other general unsecured creditors hold other general unsecured claims against the Debtors. As of the Petition Date, the Debtors estimate that the amount of such claims total approximately $3.4 million. In addition, the Debtors are party to at least three lawsuits filed against multiple defendants based on claims related to the Winter Storm Uri (collectively, the "Winter Storm Uri Litigation"). These claims have not yet been adjudicated.

IV.     **Events Leading to Bankruptcy and Prepetition Restructuring Initiatives**

      A.     **Events Leading to Bankruptcy**

30.     As described in more detail in the pleadings filed in the ERCOT Litigation, the Debtors allege that damage caused by ERCOTs actions is one of the principal causes of the Debtors' financial hardships.

31.     Additionally, in February 2021, winter storm Uri occurred (the "<u>Weather Event</u>"), which impacted the electrical generation and distribution system in the state of Texas. During the Weather Event, an electrical fire at the Temple II Project resulted in the inability of the Temple II Project to operate at its full committed capacity. As a result, Panda Temple II did not fulfill its obligations under the Secured Commodity Hedge Agreement and incurred liabilities totaling approximately $375 million.

32.     During 2022, the Debtors continued to experience financial hardship. On March 7, 2022, the Secured Parties issued a notice of default under the Credit Agreement and accelerated the obligations under the Credit Agreement. The basis for the default was that, as a result of its diminished cash position, Temple Power II failed to make the payment due to the Tax Appraisal District of Bell County in respect of 2021 tax statements.

33.     As a result of the Debtors' diminished cash position, the Debtors were also unable to remit the March 2022 principal and interest obligations due under the Credit Agreement.

34.     On April 11, 2022, the Collateral Agent posted notice, and provided notice to Panda Temple II, of its intent to hold a combined and concurrent non-judicial foreclosure sale (the "<u>May 3 Foreclosure</u>") of the Temple II Project and other property covered by the deed of trust, as well as the property covered by the pledge agreement executed by Panda Temple II and certain property

covered by the security agreement executed by Panda Temple II (all such property, the "Collateral"), which the Collateral Agent scheduled for May 3, 2022.

### B. Prepetition Restructuring Initiatives

35. In the months leading up to the filing of the Chapter 7 Cases, the Debtors explored various strategic alternatives to address their continuing liquidity constraints. As part of these efforts, the Debtors considered various operational and strategic options to increase revenue and control costs.

36. After several months of efforts by the Debtors, the Debtors determined that the Debtors did not have sufficient liquidity to operate and meet their debt service obligations, and therefore required additional sources of financing.

37. The Debtors believed, and still believe, that the preferable course for the Debtors is an orderly liquidation through Chapter 11. However, the Debtors' numerous suggestions to that effect have been summarily rejected by the Secured Lenders, who have made clear that they would not provide, nor agree to, debtor in possession financing necessary for such proceedings. Moreover, as the Secured Lenders control the cash accounts of the Debtors, none of the cash held by the Debtors has been available to the Debtors to retain a financial advisory firm or investment banking firm necessary for successful Chapter 11 cases. Given their financial position, the Debtors also determined it was not practical to obtain financing from any other sources under the current circumstances.

38. Based on the unwillingness and/or inability of the Secured Lenders to provide or permit debtor in possession financing, and the unavailability of the Debtors' funds to be used in preparation for such a filing, the Debtors determined that they did not have sufficient access to funds for a Chapter 11 process. Therefore, the Debtors were left with a choice between permitting

the May 3 Foreclosure to occur, or commencing bankruptcy cases under Chapter 7 of the Bankruptcy Code.

39.     Based on, among other things, the uncertain value of the Temple II Project and the uncertain value of the ERCOT Litigation, the Debtors determined, in a sound exercise of their business judgment, that commencing the Chapter 7 Cases was in the best interest of all creditors and the Debtors' bankruptcy estates. The Debtors filed the Chapter 7 cases to allow a breathing space for a neutral third party to evaluate and marshal the Debtors' assets for an orderly distribution. The Chapter 7 Cases also provide a centralized forum for creditors to receive notice before any assets are liquidated or claims are administered.

## V.     Post-petition Events

40.     Immediately after filing the Chapter 7 Cases, the Debtors contacted the Chapter 7 Trustee and counsel for the Chapter 7 Trustee to facilitate meetings with the Debtors' management and assist with the Debtors' transition into Chapter 7. Such meetings first occurred on May 3, 2022, and the Debtors have been in frequent communication with counsel for the Chapter 7 Trustee after the Petition Date in an effort to assist the Chapter 7 Trustee with efficiently maximizing the value of the Debtors' estates.

41.     On May 5, 2022, the United States Trustee ("UST") filed the *United States Trustee's Emergency Motion to Dismiss Under 11 U.S.C. § 707(a) with Prejudice to Refiling for 180 Days* (the "Motion"). In the Motion, the UST requests that the Court dismiss the Chapter 7 Cases pursuant to section 707(a) of the Bankruptcy Code with prejudice to refiling for 180 days based on the UST's allegation that the Chapter 7 Cases were filed in bad faith.

**Response**

I.      **The Bankruptcy Cases Should Not be Dismissed**

     A.      **The Bankruptcy Cases were Filed in Good Faith**

42.     The UST's Motion should be denied because the Debtors filed the Chapter 7 Cases in good faith for the purpose of allowing a neutral third party, the Chapter 7 Trustee, to evaluate and marshal assets for an orderly distribution to creditors.

43.     Section 707(a) of the Bankruptcy Code provides, "The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including (1) unreasonable delay by the debtor that is prejudicial to creditors; (2) nonpayment of any fees or charges required under chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States Trustee." 11 U.S.C. § 707(a).

44.     As explained by the Fifth Circuit, "'[c]ause' is a broad concept, designed to afford flexibility to the bankruptcy courts." *In re Cypress Financial Trading Co., L.P.*, 620 Fed. Appx. 287 (5th Cir. 2015). Bad faith, in circumstances where it exists, can constitute cause for dismissal under section 707(a) of the Bankruptcy Code. *In re Krueger*, 812 F.3d 365 (5th Cir. 2016).

45.      "Dismissing for bad faith conduct comports with the broader concept of preventing an abuse of the bankruptcy process through the filing of a petition by those with unclean hands." *In re Hesed Enterprises, LLC*, 2017 WL 4457434 (Bankr. N.D. Tex. 2017). "Consideration of abuse by the debtor requires the court to engage in a wide-ranging inquiry, with an eye to the debtor's entire course of conduct for evidence of non-economic motives unworthy of bankruptcy protection." *Id.* (quotations omitted).

46.     In an individual chapter 7 case, proper motives for filing such petition include the desire for "an efficient, orderly, and timely disposition of the debtor's assets in exchange for a discharge from debt." *Id.* (citing *In re Krueger*, 812 F.3d at 373). For corporate debtors, a discharge is not available. 11 U.S.C. § 727(a)(1). Therefore, for corporate debtors, a court's decision to dismiss ultimately comes down to whether the chapter 7 case was filed for an orderly disposition of assets, or, if instead, it was filed for some other, unworthy purpose. *Id. See also In re Cypress Financial Trading Co., L.P.*, 620 Fed. Appx. 287 (5th Cir. 2015) ("Nevertheless, a corporate Chapter 7 (and the resulting automatic stay) may allow breathing space for a neutral third party to marshal assets for orderly distribution to creditors.").

47.     Here, the Debtors filed the Chapter 7 Cases to facilitate the orderly disposition of assets.  In the Motion, the UST takes the position that "[t]he Debtors have no unencumbered assets." Motion ¶ 21.[5] However, the UST fails to recognize the possibility that the value of the Debtors' assets may ultimately exceed the value of secured claims against the Debtors. Specifically, no recent valuation or appraisal has not been performed on the Temple II Project, so the value is uncertain at this time. Moreover, the Debtors have been approached by a party with experience in power plants who has expressed an interest in bidding on the Temple II Project. Additionally, the value of the ERCOT Litigation could ultimately prove substantial. Given the possible upside for general unsecured creditors, the Debtors believe that administering the Chapter 7 Cases is the best available option to, among other things, preserve the value of the Debtors' estates, provide an efficient forum for administering claims, and to provide notice and a centralized forum for creditors to evaluate the Debtors assets and have an opportunity to be heard.

---

[5] Notably, the schedules and statements of financial affairs have not yet been filed in the Chapter 7 Cases, the 341 meeting has not occurred, and the Chapter 7 Trustee has not yet had meaningful opportunity to consider the scope of the Debtors' assets or the Secured Parties' liens.

### B. Recent Precedent Weighs Against Dismissal Under Similar Circumstances

48.     Recently, a debtor engaged in the business of owning and operating a power facility filed a chapter 7 case in the Southern District of Texas, and the chapter 7 trustee obtained authority to operate the debtor as a going concern.

49.     On March 18, 2022, Brazos Sandy Creek Electric Cooperative, Inc. ("Brazos Sandy Creek") filed a voluntary chapter 7 case in the Bankruptcy Court for the Southern District of Texas, Case No. 22-30682. On Brazos Sandy Creek's petition, Brazos Sandy Creek indicated that after any administrative expenses are paid, no funds would be available for distribution to unsecured creditors.

50.     As set forth in the *Trustee's Emergency Motion for Authority to Operate Pursuant to 11 U.S.C. § 721 Effective as of March 18, 2022* [Dkt. 26] (the "Brazos Sandy Creek Motion to Operate"), Brazos Sandy Creek is the partial owner of a 940-megawatt coal-fired electricity generation facility located in McLennan County, Texas. In the Brazos Sandy Creek Motion to Operate, the chapter 7 trustee sought authority to continue to operate Brazos Sandy Creek as a going concern to preserve the value of Brazos Sandy Creek's assets, including performing under its existing agreements and entering into new agreements as may be necessary or advisable to continue Brazos Sandy Creek's operations. The Brazos Sandy Creek Motion to Operate was approved on March 28, 2022. *See* Dkt. 35. On April 13, 2022, the chapter 7 trustee in Brazos Sandy Creek filed a notice that a dividend may be paid to unsecured creditors and established a proof of claim deadline. *See* Dkt. 54.

51.     Notably, it does not appear that any creditors or parties in interest took the position that the Brazos Sandy Creek's chapter 7 case was filed in bad faith.

52.     Moreover, the cases cited by the UST are factually distinguishable from the Chapter 7 Cases. For example, the UST asserts, without analysis, that the facts of the Chapter 7 Cases are analogous to *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071-72 (5th Cir. 1986). Motion ¶ 21.

53.     In *Little Creek Development Co.*, the Fifth Circuit reversed a bankruptcy Court's decision to lift the automatic stay in a chapter 11 case because it found that more evidence was necessary to support the bankruptcy court's conclusion that the debtor filed its bankruptcy case in bad faith. The Fifth Circuit identified a non-exclusive list of factors that usually exist in support of a bad faith finding, including (i) the debtor has one asset; (ii) a secured creditor's liens encumber the asset' (iii) there are generally no employees; (iv) there is generally little or no cash flow, and no available resources to make adequate protection payments; (v) there are only few, if any, unsecured creditors whose claims are relatively small; (vi) the property has usually been posted for foreclosure because of arrearages on the debt, or alternatively the debtor and one creditor may have proceeded to a stand still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford; and (vii) there are sometimes allegations of wrongdoing by the Debtor or its principals. *See In re Little Creek Dev. Co.*, 779 F.2d at 1072.

54.     Here, the Debtors have multiple assets, including the Temple II Project and the ERCOT Litigation; the Debtors have active officers and directors; prior to the commencement of the Chapter 7 Cases, the Debtors generated substantial cash flow; there are numerous general unsecured creditors, with general unsecured claims totaling several hundred million dollars; and there has not been any allegations of wrongdoing by the Debtors or their principals (aside from the UST's allegations related to the decision to file the Chapter 7 Cases).

55.     Most importantly, the Debtors believe there is a possibility of a distribution to general unsecured creditors. The Chapter 7 Cases were filed in good faith and should not be

dismissed. The Chapter 7 Trustee should have the opportunity to evaluate the Debtors' assets and administer the Chapter 7 Cases.

## II. There is No Basis to Dismiss with Prejudice for 180 Days

56. In the Motion, the UST asserts that "[c]ause exists to dismiss these cases with prejudice to re-filing for 180 days." Motion ¶ 24. The UST's justification for this position is that "Beal Bank needs sufficient time to recover its collateral, and the facts will not improve during the next 180 days such that a bankruptcy will benefit other creditors." *Id.*

57. Even if dismissal was warranted, which it is not, the UST's conclusory statements are not a sufficient basis for establishing a 180-day time period prior to re-filing. Applicable law would allow the Collateral Agent (and other secured parties) to foreclose on collateral relatively quickly. In the event these Chapter 7 Cases are dismissed now, the Debtors should not be prejudiced from seeking bankruptcy protection soon after their secured creditors foreclose for the efficient administration of their remaining assets and claims.

## <u>Conclusion</u>

**WHEREFORE**, based on the foregoing, the Debtors respectfully request that the Court (i) deny the Motion, and (ii) grant such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED this 6th day of May, 2022.

**HAYNES AND BOONE, LLP**

By: _/s/  Ian T. Peck_
Ian T. Peck
State Bar No. 24013306
Eli O. Columbus
State Bar No. 24028062
David L. Staab
State Bar No. 24093194
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile:  214.651.5940
Email: ian.peck@haynesboone.com
Email: eli.columbus@haynesboone.com
Email: david.staab@haynesboone.com

**ATTORNEYS FOR DEBTORS**

4855-1459-5102